## AFFIDAVIT OF TASK FORCE OFFICER JOHN E. MAKI

I, John E. Maki, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a detective with the Fitchburg Police Department Drug Suppression Unit ("FPD-DSU") assigned as a Task Force Officer with the United States Drug Enforcement Administration ("DEA") High Intensity Drug Trafficking Area ("HIDTA") Group in Worcester, Massachusetts.  I have been a police officer since 1985 and have been assigned to the Bureau of Criminal Investigation and DSU since August 2001.   In addition, since 2003 I have been assigned to the North Worcester County Drug Task Force ("NWCDTF").  Since January 2011, I have been a Task Force Officer with the DEA.  I have received a Bachelor of Science in Law Enforcement from Western New England College.   During the course of my career as a police officer, I have attended and completed courses relative to narcotic investigations sponsored by the Massachusetts Criminal Justice Training Council, the Narcotic Enforcement Officers Association, the New England Narcotic Enforcement Officers Association, Proactive Criminal Enforcement ("PACE") and Hutchinson Law Enforcement Training, LLC.   Through these courses, I have received special training in the field of identification, distribution, trafficking and usage of narcotics.  I have also gained experience through working with other officers who have had training and experience in the field of narcotic enforcement.  I have also attended the 80 hour Basic Narcotics Investigation School conducted by the DEA as well as the DEA's Task Force Officers orientation.   I have also attended and completed courses in interviewing and interrogation at the Reid School.

2.      Throughout my career, I have conducted or participated in hundreds of narcotics investigations and arrests, both in uniform and as an undercover police officer.  In my experience

as an undercover police officer, I have participated in numerous drug transactions and have witnessed hundreds of others, involving illegal drugs such as cocaine, cocaine base (more commonly referred to as crack cocaine), heroin, methamphetamine, ecstasy, and marijuana.  I have conducted or participated in physical surveillance, the execution of hundreds of search warrants, the handling and debriefing of informants and cooperating witnesses, and the reviews of taped conversations and drug records.  Through my education, training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored and distributed, including the use of vehicles to transport, hide and store drugs; the practices and procedures commonly employed by narcotics traffickers to conduct their business, including the use of telephones, cellular telephones and pagers; the method of payment for such drugs; and some of the methods that are used to hide their illegal drugs from the police, as well as some of the methods used to disguise the source and nature of the profits made by narcotics traffickers.  I am also familiar with various terminology, codes and street terms used by drug dealers in the course of a negotiation and drug transaction to disguise the nature of their business.

3.      I have acted as the affiant for numerous state search warrant applications which have resulted in the arrest and prosecution of various distribution, transportation, and supply groups based in Massachusetts.  I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I have also reviewed taped conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of

payment for such drugs.  I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.      I submit this Affidavit in support of the issuance of arrest warrants for, and a criminal complaint against, Ivan CRUZ-RIVERA ("CRUZ-RIVERA") and Carlos JIMENEZ ("JIMENEZ") (together, the "Defendants"), charging them with one count of Conspiracy to Violate the Controlled Substances Act ("CSA"), in violation of Title 21, United States Code, Section 846, and Possession with Intent to Distribute and Distribution of Heroin, in violation of Title 21, United States Code, Section 841(a) (together, the "Subject Offenses").  As described herein, there is probable cause to believe that the Defendants committed the Subject Offenses on or about October 4, 2013.

5.      This investigation, which began in November 2011, is being conducted by DEA HIDTA in cooperation with the FPD-DSU, the Bureau of Alcohol, Tobacco and Firearms ("ATF") and NWCDTF.   The information contained within this Affidavit is based upon information I have gained from my investigation, my personal observations, my training and experience, and/or reports and information related to me by other law enforcement officers and/or agents, a former Confidential Source ("CS")[1] for the DEA, an individual cooperating with law enforcement who is willing to testify ("CW"), and public and private databases.  Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

---

[1] The CS is no longer an active confidential source with the DEA since the CS's arrest in October 2013 after a domestic incident with the CS's spouse.

## RELEVANT STATUTES

6.     Generally, Title 21, United States Code, Section 841(a) makes it illegal to manufacture, distribute or possess with the intent to distribute a controlled substance.

7.     Generally, Title 21, United States Code, Section 846 makes it illegal to conspire to commit a violation of the CSA.

8.     Title 21, United States Code, Section 812 identifies heroin as a Schedule I controlled substance.

## PROBABLE CAUSE

9.     This affidavit stems from an investigation conducted by DEA HIDTA Group in Worcester, in cooperation with the FPD-DSU, ATF and NWCDTF.

10.     During the course of the investigation, the CS made multiple undercover purchases of heroin, as determined by the DEA Laboratory, from two individuals in the Leominster area, Individual #1 and Individual #2, who were subsequently charged with violations of the CSA.

A.     October 4, 2013 Drug Transaction

11.     On October 4, 2013, the CS and an undercover officer ("UC") went to the garages located at 105/107 Union Street, Leominster, Massachusetts (the "105/107 Garages"), to attempt to purchase heroin directly from Individual #1, who was believed to be supplying Individual #2 from whom the CS had previously purchased heroin.  Specifically, the CS and the UC went to the first garage closest to Union St. (the "Front Garage"), where the CS got out of the vehicle, walked into the open bay door of the Front Garage and had a brief conversation with Individual #1.  Individual #1 then walked outside, looked inside the UC vehicle, and acknowledged the UC. The CS walked with Individual #1 inside the Front Garage to the rear where an office and desk

were located.  The CS and Individual #1 discussed the CS's purchase of 125 grams of heroin, and Individual #1 told the CS that Individual #1 would give the CS a good price.

12.     During this interaction, Individual #1 was on the telephone, apparently giving directions to the 105/107 Garages.  Individual #1told the CS that "it was on the street" and was "coming," and assured the CS that the CS would have the heroin by 1:30 p.m.  Individual #1instructed the CS to call Individual #2 directly before coming back at 1:30 p.m.

13.     Within approximately three minutes of the CS leaving, surveillance observed Individual #1exit the Front Garage and walk out to the street while talking on Individual #1's cell phone.  Individual #1waved to a Gray Lexus bearing New Jersey registration D17CLD ("NJ Lexus"), which pulled into the 105/107 Garages and continued to the rear garage furthest from Union St. (the "Rear Garage").  Individual #1closed the Front Garage bay door, and walked along the exterior of the 105/107 Garages to the Rear Garage where the NJ Lexus had just parked.  Approximately 33 minutes later, Individual #1was observed walking from the area of the Rear Garage and re-entering the Front Garage.

14.     At approximately 2:09 p.m., the NJ Lexus, occupied by two dark skinned Spanish males, left the 105/107 Garages on Union St., and approximately two minutes later, made a U-turn and began heading back towards the 105/107 Garages.  Individual #1exited the Front Garage, talking on Individual #1's cell phone, and walked hurriedly towards Union St. Individual #1waved to the NJ Lexus and motioned towards Graham St., where the NJ Lexus subsequently turned.  Individual #1returned to the Front Garage and closed the door.

15.     Approximately 10 minutes after the NJ Lexus left the 105/107 Garages, Individual #2 called the CS and stated that Individual #1 wanted $62.50 per gram for the heroin. CS thereafter drove to the 105/107 Garages, again accompanied by the UC.  Approximately

5

twelve minutes after the CS arrived, Individual #1 exited the Front Garage and walked towards the Rear Garage where the UC vehicle was parked.   Individual #1met the CS at the front passenger door, and in the UC's presence, gave the CS a small cardboard box which contained the heroin in exchange for $7500.   Individual #1told the CS how strong the heroin was and pointed to the lines around Individual #1's mouth, telling the CS that "I wear a mask."

16.     Massachusetts State Police ("MSP") followed the NJ Lexus after it left the 105/107 Garages until it went into Sturbridge, MA.   MSP Trooper David M. DiCrescenzo, who was operating a fully marked MSP cruiser in Sturbridge, was advised by another MSP trooper that the NJ Lexus had left Leominster after a suspected drug drop.   The MSP trooper advised Trooper DiCrescenzo to follow the NJ Lexus and attempt to effectuate a stop of the vehicle if warranted.   Trooper DiCrescenzo located the NJ Lexus, followed it, observed the driver make a marked lane violation and drive above the speed limit, and initiated a stop of the vehicle at approximately 3:15 p.m.

17.     Trooper DiCrescenzo approached the NJ Lexus from the passenger side, and observed two male occupants.   After identifying himself and informing the operator of the NJ Lexus of the reason for the stop, Trooper DiCrescenzo asked the operator for his license and the vehicle's registration.[2]   Trooper DiCrescenzo observed that the driver's hands were visibly shaking and that the passenger was fidgeting in his seat, and staring straight ahead without making eye contact with the trooper.   Trooper DiCrescenzo observed the driver's hand tremble as he was removing his driver's license from his wallet.   Based upon the observed nervousness of the occupants, Trooper DiCrescenzo asked the operator when he was last stopped by the police.   The operator responded that he had never been stopped by the police before and stated "I follow the law."

---

[2]  The NJ Lexus was registered to Christine Jimenez with the same address as JIMENEZ's in Englishtown, NJ.

18.     The driver then produced a NJ license along with a firefighter badge which identified him as Carlos JIMENEZ.  During Trooper DiCrescenzo's interaction with the men, the passenger continued to move around in his seat, while staring straight ahead, and made nervous gestures.  Trooper DiCrescenzo asked where the men were coming from, and JIMENEZ responded that they were coming from Lawrence.  When asked how long they had been in Lawrence, JIMENEZ responded that they had been there only a couple of hours, explaining that they left NJ early in the morning to visit family in Lawrence, and that after an approximate two hour visit, were on their way back to NJ.

19.     Based upon information provided previously to him by the other MSP trooper, Trooper DiCrescenzo knew that the NJ Lexus had just come from Leominster, not Lawrence as JIMENEZ had claimed.  That information, combined with the nervousness of JIMENEZ and the passenger and the purported quick trip to an area that Trooper DiCrescenzo knew to be a drug distribution area, led Trooper DiCrescenzo to request identification from the passenger.  The passenger produced a Puerto Rican license identifying himself as Ivan CRUZ-RIVERA.

20.     Trooper DiCrescenzo returned to his cruiser, confirmed that JIMENEZ's driver's license was active, and that neither JIMENEZ nor CRUZ-RIVERA had any outstanding warrants.  Given his suspicions detailed above, Trooper DiCrescenzo returned to the NJ Lexus and asked JIMENEZ to step outside of the vehicle to ask him some questions.

21.     JIMENEZ provided conflicting answers to Trooper DiCrescenzo about his trip. For example, when asked where he went in Lawrence, JIMENEZ was unable to provide an address and stated that his cousin met him at a store.  When asked for more information about his cousin, JIMENEZ stated it was actually his brother-in-law, not cousin, but was unable to provide a name for his brother-in-law.  When asked whether they made any other stops during their trip

besides Lawrence, JIMENEZ replied "no."   JIMENEZ denied having any weapons or drugs in the car, but stated he was "not sure" if there were any large sums of cash in the vehicle and told Trooper DiCrescenzo that CRUZ-RIVERA had "some money."   When asked how much money his passenger had, JIMENEZ stated he was not sure but that CRUZ-RIVERA had money because he was looking at a truck to purchase.   JIMENEZ did not have a good explanation for why he failed to provide that information to the trooper when he was asked if he made any additional stops during their trip.   Given JIMENEZ's inconsistent answers, Trooper DiCrescenzo asked him to wait in the back of the cruiser while he questioned CRUZ-RIVERA.   JIMENEZ, who was not placed in handcuffs, agreed.

22.     Trooper DiCrescenzo approached CRUZ-RIVERA and asked him to step outside of the vehicle.   During their conversation, Trooper DiCrescenzo observed that CRUZ-RIVERA was trembling and seemed nervous.   CRUZ-RIVERA denied making any additional stops besides Lawrence during the trip, and denied having any drugs or weapons in the car.

23.     When asked about whether there were any large sums of cash in the vehicle, CRUZ-RIVERA reached into his pocket and retrieved a small amount of cash.   When questioned as to whether that was all of the cash, CRUZ-RIVERA gave evasive answers.   Trooper DiCrescenzo informed CRUZ-RIVERA that JIMENEZ stated there was money in the car, at which point CRUZ-RIVERA stated he did not understand.   Trooper DiCrescenzo called a fluent Spanish speaking MSP trooper to translate the conversation.   CRUZ-RIVERA stated that there was one thousand dollars in the car.   Trooper DiCrescenzo asked CRUZ-RIVERA if he would mind showing the cash to him, and CRUZ-RIVERA agreed.   CRUZ-RIVERA reached into the back seat of the NJ Lexus and retrieved a black bag.   CRUZ-RIVERA then attempted to use his body to block Trooper DiCrescenzo's view of the bag while CRUZ-RIVERA retrieved

something from inside the bag.  Trooper DiCrescenzo, fearing for his safety, asked CRUZ-RIVERA to step aside so he could see the contents of the bag, but CRUZ-RIVERA did not comply and continued to reach into the bag.  Trooper DiCrescenzo pushed CRUZ-RIVERA slightly to the side so he could see the bag, and when he did, the trooper observed multiple bundles of cash in a manila folder inside the bag.  CRUZ-RIVERA removed one of the bundles of cash and showed the trooper what appeared to be $1000 in US currency.  CRUZ-RIVERA was unable to provide an answer as to why he had so much cash.  Trooper DiCrescenzo asked CRUZ-RIVERA to wait on the side of the road.

24.     Trooper DiCrescenzo returned to JIMENEZ and informed him that he saw money in the vehicle and asked for his consent to search the vehicle.  JIMENEZ consented to a search, and another trooper, MSP Trooper Boland, arrived on the scene to assist.

25.     During the search, $44,000 in US currency, bound with elastics into twelve separate bundles, was located inside the black bag that had been on the back seat of the NJ Lexus.  In addition, three cell phones were seized; one was located in the black bag next to the large sum of US currency, and the other two were located under the front passenger seat.

26.     Based on his training and experience, Trooper DiCrescenzo recognized the packaging of the cash to be consistent with the proceeds of drug trafficking.  For these reasons, and the large amount of cash present, Trooper Boland requested a K-9 dog.  The canine subsequently positively alerted to the black bag where the money was contained, and to the money itself.  In response to questioning as to why he had so much cash, CRUZ-RIVERA stated he was looking at a truck to purchase.

27.     Although the money was seized, both JIMENEZ and CRUZ-RIVERA and the car were released given the ongoing nature of the DEA investigation.

B.      CW Cooperation[3]

28.      The CW has provided the following information regarding CRUZ-RIVERA and JIMENEZ.

29.      The CW first met CRUZ-RIVERA in 2010 or 2011 after having been introduced by a mutual acquaintance.  CW subsequently began to purchase cocaine, initially, and then in approximately 2012, heroin, from CRUZ-RIVERA.

30.      On October 4, 2013, CRUZ-RIVERA and another individual delivered a half-kilo of heroin to Individual #1 at the 105/107 Garages.  CRUZ-RIVERA introduced the CW to the other individual by name, but the CW could not recall the name.  CRUZ-RIVERA told the CW that the other individual was a firefighter and had been for many years.  The firefighter told the CW that he drove because it was less likely he would get in trouble if he were pulled over as he was a firefighter.  CRUZ-RIVERA told the CW that he (CRUZ-RIVERA) and the firefighter had been friends for a long time and that the firefighter helps him with "trips" such as the one he made to the 105/107 Garages that day because there was a lower likelihood of the firefighter getting pulled over by police.

31.      CRUZ-RIVERA had a dark gym bag that contained the half-kilo of heroin.  The CW reported that CRUZ-RIVERA gave the heroin to Individual #1, and Individual #1 gave CRUZ-RIVERA $44,000 in US currency bundled in stacks of thousands in a vacuum-sealed bag.  CRUZ-RIVERA placed the $44,000 inside the same dark gym bag that the heroin had been in.

32.      CRUZ-RIVERA and the firefighter discussed the quality of the heroin with Individual #1, and the firefighter told Individual #1 that the heroin was of great quality.  The

---

[3] Additional details relating to the CW are included in Exhibit 1 to this Affidavit, which is being submitted under seal.

firefighter also told Individual #1 that he (the firefighter) had previously visited family in Lawrence, Massachusetts and commented on the price of houses there.

33.     Individual #1 received a telephone call on his cell phone later that afternoon from CRUZ-RIVERA's son, who reported that "something bad" had happened and directed Individual #1 to call CRUZ-RIVERA on a different telephone number.  Individual #1 called the number provided, and recognized the individual who answered the call to be the firefighter.  Individual #1 then spoke with CRUZ-RIVERA who told Individual #1 about the car stop and the seizure of the $44,000.  Individual #1 reported that CRUZ-RIVERA was very upset because he owed money to his heroin supplier and was afraid of the consequences of not having the money. Individual #1 subsequently loaned CRUZ-RIVERA $7,000 in cash the following day.

C.     Telephone Records

34.     Telephone records for October 4, 2013 indicate a total of 11 telephone calls between Individual #1's telephone (⬛⬛⬛⬛) and CRUZ-RIVERA's telephone (⬛⬛⬛⬛ ⬛⬛) between 9:54 a.m. and 2:12 p.m., which also correspond with the times the CS or surveillance observed Individual #1 on the telephone appearing to give directions.  During the consensual recording from the CS that day, which recorded portions of Individual #1's conversation on the telephone, Individual #1 at one point said the name "Ivan."  In addition, telephone records also indicate a total of 13 contacts between Individual #1's telephone and CRUZ-RIVERA's telephone between October 1 and 3, 2014.

35.     Telephone records for October 4, 2013 indicate that Individual #1's telephone was in contact with telephone number ⬛⬛⬛⬛ ("JIMENEZ's telephone"), which is subscribed to Christine Jimenez, 10 times between 4:38 p.m. and 7:58 p.m., after the NJ Lexus was pulled over by Trooper DiCrescenzo.  Further telephone analysis indicates that JIMENEZ's telephone

was in contact with CRUZ-RIVERA's telephone three times on October 2 and 3, 2013, the day

before the trip to the 105/107 Garages, and twice in the early morning hours of October 4, 2013.

## CONCLUSION

36.      Based upon the above information, I submit there is probable cause to believe that

on or about October 4, 2013, the Defendants committed the Subject Offenses, and accordingly, I

respectfully submit that there is probable cause for the issuance of criminal complaints against

and arrest warrants for CRUZ-RIVERA and JIMENEZ for conspiracy to violate the CSA, in

violation of 21 U.S.C. § 846 and possession with intent to distribute and distribution of heroin, in

violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2 (aiding and abetting).

JOHN E. MAKI
Task Force Officer,
U.S. Drug Enforcement Administration

15th
Subscribed and sworn to before me on this __ day of April, 2016.

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

12